UNITED STATES of America, Appellee,

v.

Nick STAVROULAKIS, Defendant-Appellant.

No. 196, Docket 91–1289.

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1991.

Decided Jan. 3, 1992.

Roger J. Bernstein, New York City (Bernstein & Miller, of counsel) for defendant-appellant.

Andrea M. Likwornik, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty. and Daniel C. Richman, Asst. U.S. Atty., S.D.N.Y., of counsel) for appellee.

Before KAUFMAN, KEARSE and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Nick Stavroulakis appeals from his convictions on all counts of a four-count indictment. Count One charged, pursuant to 18 U.S.C. § 371, that Stavroulakis conspired with Kostas Giziakis to violate the money laundering statute (18 U.S.C. § 1956) by attempting to conceal the source of certain money alleged to be the proceeds of unlawful activity, and to avoid the currency reporting requirements of Title 31. Counts Two and Three charged Stavroulakis with bank fraud by engaging in a scheme or artifice to defraud a federally chartered or insured financial institution. 18 U.S.C. § 1344. Count Four charged defendant with uttering and possessing forged securities. 18 U.S.C. § 513.

On appeal, Stavroulakis raises numerous issues, several of which merit our attention. First, he argues that the government failed to prove a conspiracy to violate the money laundering statute, as there was no proof of an agreement on the essential nature of the conspiracy. He also claims that the indictment failed to charge bank fraud, and, even if it did, the evidence adduced at trial failed to support the bank fraud convictions. Stavroulakis next asserts that he is entitled to a new trial because the prosecutor, during jury selection, exercised one of her peremptory challenges in a racially discriminatory manner. Finally, defendant claims that Judge Griesa's refusal to grant him a Judicial Recommendation Against Deportation at sentencing was premised on an *ex post facto* violation. We reject each of these arguments, and affirm.

## BACKGROUND

### Money Laundering Conspiracy

In February 1989, a confidential government informant introduced Stavroulakis to an undercover FBI agent, David Maniquis, who said he was connected with organized-crime figures eager to launder substantial amounts of cash derived from narcotics transactions. Stavroulakis took the bait and agreed to introduce Maniquis to his accountant, Charlie Kirkelis, assuring Maniquis that if Kirkelis could not help, Stavroulakis had other ways to launder the cash.

When Kirkelis eventually demurred, Stavroulakis agreed to enlist the help of an acquaintance, Kostas Giziakis, an officer at the National Mortgage Bank of Greece ("NMBG"). Agent Maniquis was amenable to laundering the money through the NMBG, if, besides concealing the source of the money, Giziakis would also be willing to circumvent any currency reporting requirements. Maniquis stressed to Stavroulakis the need for secrecy because of the illegal source of the cash. Stavroulakis agreed that secrecy was paramount, and, with Maniquis' blessing, proceeded to contact Giziakis.

Soon thereafter, in May 1989, Stavroulakis and Agent Maniquis ventured to the NMBG branch in Astoria, Queens, to meet Giziakis. Prior to entering the bank, Stavroulakis outlined an elaborate scheme—which he and Giziakis had already concocted—for laundering the money: Stavroulakis would open an account at the NMBG in his own name, the money would be deposited in that account and then transferred to Greece, where it would be funneled through a fictitious corporation and returned to the NMBG, ostensibly as legitimate corporate earnings. Stavroulakis also told Maniquis that Giziakis was under the impression that the money was derived from gambling, rather than narcotics transactions. Stavroulakis explained that when he had first broached the subject with Giziakis, he had decided to tell Giziakis the money came from gambling because Giziakis appeared to have scruples about laundering narcotics money.

Once inside the NMBG, the three individuals ironed out the scheme to launder the money. Agent Maniquis represented to Giziakis that the cash was the product of a numbers operation run by his alleged associates. He informed Giziakis that his associates obtained hundreds of thousands of dollars per month in small bills from gambling, and that they wanted to make the cash appear to come from a legitimate source. Giziakis agreed to accommodate Maniquis, and said he could launder large amounts of cash through the NMBG.

Several weeks later the three of them met again at the NMBG. Because Stavroulakis was late for this meeting, Maniquis and Giziakis spoke privately for a few minutes. After handing Giziakis $2,000 in cash as the initial deposit, Maniquis warned Giziakis that gambling proceeds were almost always in small denominations, and told Giziakis of his concern over toting the money into the bank in a large gym bag. Giziakis assured Maniquis that this would be no problem. His concerns assuaged, Maniquis then told Giziakis that he would soon deposit $30,000 for the first month. At that point, Stavroulakis arrived and signed the account-opening card. The stage was now set to execute the scheme.

## Bank Fraud

While the money-laundering plot was brewing, Stavroulakis decided to call upon Agent Maniquis for assistance in other nefarious plans. Defendant informed the agent that he and his associates were able to obtain stolen checks, which they were looking to sell. Maniquis obligingly volunteered that he had a contact at a check-cashing establishment who would help, and since the check-cashing business was bonded, the only one that would lose money would be the bank on which the checks were drawn. Stavroulakis and Maniquis then struck a deal whereby Maniquis would pay Stavroulakis a commission between 5% and 10% of the balance of the account on which the checks were drawn.

Stavroulakis subsequently offered Maniquis two sets of stolen checks. The first was a book of checks drawn on the account of ESM General Merchandise Ltd. at the Republic National Bank. Along with these checks, Stavroulakis offered a sample signature for the ESM account, which one of his cronies had filched. Maniquis paid one of Stavroulakis' associates $5,000 for the stolen ESM checks, and later paid Stavroulakis $2,000 for his participation in the scheme. Stavroulakis subsequently sold Maniquis a second set of stolen checks, drawn on the account of Nature's Gifts Ltd. at Bank Leumi. Stavroulakis received $500 from Maniquis as compensation for the Bank Leumi checks.

## Jury Selection

A grand jury subsequently indicted Stavroulakis and Giziakis. Stavroulakis, however, went to trial alone because Giziakis became a fugitive. During jury selection, the district court questioned venireman Eddie Holmes, a black male who, in response to the judge's questioning, indicated that he was unmarried, without a full-time job, and had been employed "off and on" for the preceding five years as a maintenance worker in a public school in the Bronx. After the court finished its questioning, the prosecutor exercised one peremptory challenge to excuse Holmes. Roger Bernstein, defense counsel, immediately engaged in the following colloquy with the district court:

> MR. BERNSTEIN: I want to say that the juror that was excused was black and at the very least I think you should put a nondiscriminatory juror—
>
> THE COURT: I don't follow the reasoning. This is a ridiculous objection. This is a complex case. He should be excused. I would almost excuse him for cause. There is no other way to do it. In the first place, your client is not black. Let's not waste time with this kind of thing.

Defense counsel made no further comment, and jury selection continued.

## Sentencing

On April 29, 1991, after Stavroulakis had been convicted on all four counts in the indictment, the district court sentenced him to thirty-seven months of imprisonment, to be followed by two years of supervised release. At sentencing, Stavroulakis, a

Greek national, requested that the district court enter a Judicial Recommendation Against Deportation ("JRAD"). The court denied this request on two alternative grounds. First, the district court noted that the Immigration Act of 1990 had eliminated the authority of district courts to enter JRADs, and it held that, even though the repeal had taken effect after Stavroulakis had committed his crimes, there was no *ex post facto* violation. Alternatively, the district court held that, even if it had the authority, it would deny the JRAD as inappropriate in this case.

Stavroulakis now appeals.

## DISCUSSION

### Money Laundering Conspiracy

Stavroulakis argues that his conviction for conspiracy to violate the money laundering statute cannot stand because there was no agreement on the essential nature of the plan. More precisely, he claims that because he believed the money came from narcotics while Giziakis—his co-conspirator—believed it came from gambling, no conspiratorial agreement existed. We disagree.

■ The money laundering statute provides in pertinent part:

(3) Whoever, with the intent—

(A) to promote the carrying on of specified unlawful activity;

(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

(C) to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

18 U.S.C. § 1956(a)(3). Subsection (c)(7) of this statute then defines the term "specified unlawful activity," and it enumerates a myriad of activities that are illegal under either federal or state law, including *both* felony-level gambling and narcotics transactions. 18 U.S.C. § 1956(c)(7).

The issue, therefore, is whether a conspiracy to violate 18 U.S.C. § 1956(a)(3) requires that the co-conspirators believe that the money to be laundered is derived from the *same* specified unlawful activity. To be more specific, is there a conspiracy to launder money when one of the conspirators believes the cash stems from narcotics transactions while the other believes the money came from illegal gambling? We believe the answer must be yes.

■ A conspiracy involves an agreement by at least two parties to achieve a particular illegal end. *See United States v. Gleason*, 616 F.2d 2, 16–17 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir.1977). While the conspirators need not agree on every detail of their venture, there must be proof beyond a reasonable doubt that they agreed on the "essential nature of the plan." *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); *see United States v. Attanasio*, 870 F.2d 809, 816–17 (2d Cir.1989). It is not required that they agree on the ancillary aspects of a scheme not running to the heart of the agreement. The policies underlying conspiratorial liability could easily be thwarted by the careful compartmentalization of information, and "conspirators would go free by their very ingenuity," if it were required that they agree on all details of the scheme. *Blumenthal*, 332 U.S. at 557, 68 S.Ct. at 256; *see United States v. Feola*, 420 U.S. 671, 693–94, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975). To vindicate these policies, we focus on the essence of the underlying illegal objective to determine whether the conspirators agreed on "what kind of criminal conduct was in fact contemplated." *United States v. Gallishaw*, 428 F.2d 760, 763 n. 1 (2d Cir.1970); *see Gleason*, 616 F.2d at 16. Where, as here, the indictment charges a conspiracy under the "offense" clause of the conspir-

acy statute [1], the conspirators must have agreed to commit the same offense to satisfy the rule that they have agreed on the essential nature of the plan. *See Rosenblatt*, 554 F.2d at 41.

■ The issue can be distilled, therefore, to the question whether, as part of the "essential nature" of a conspiracy to launder unlawfully acquired money, it is necessary that the conspirators agree on where the unlawful money will come from. We think not. We hold that, so long as the unlawful source is proven to be one of the illegal activities enumerated in § 1956(c)(7), it is not essential that the conspirators agree on the same illegal activity.

Section 1956 creates the crime of money laundering, and it takes dead aim at the attempt to launder dirty money. Why and how that money got dirty is defined in other statutes. Section 1956 does not penalize the underlying unlawful activity from which the tainted money is derived. That the money is represented to be the proceeds of one of the listed, illegal sources is, of course, essential to culpability. The statute, however, does not distinguish among these specified unlawful activities either in degrees of importance or levels of criminal culpability. All the specified unlawful activities are clustered, almost willy-nilly, under a single definition section of the statute. So long as the cash is represented to have come from *any* of these activities, a defendant is guilty of the substantive offense of money laundering.

Defendant's argument would require us to accept that one who launders illegal gambling money has engaged in a course of conduct essentially different from that of someone who launders narcotics money. Congress has made clear that concealing the source of illegal gambling proceeds is just as detrimental to society as concealing the source of narcotics money. The crime is the same: money laundering; the *partic-*

*ular* underlying activity specified by Congress is a necessary, but ancillary, concern.

Defendant makes the policy argument that because some individuals—such as Giziakis—might be willing to launder gambling money but not narcotics money, the *particular* specified unlawful activity is an essential element of the crime. Again, we need look only to the language of the statute to reject this argument. Congress did not distinguish among the specified unlawful activities; both gambling and narcotics proceeds trigger the money laundering statute.

The legislative history, while scant, supports our view that the focal point of the statute is the laundering process, not the underlying unlawful conduct that soiled the money. Congress did not submit any reports with the Anti–Drug Abuse Act of 1986, which contained the Money Laundering Control Act of 1986. *See* 1986 U.S.Code Cong. & Admin.News 5393. However, two related reports provide some insight into the purpose behind the money laundering statute. *See* S.Rep. No. 433, 99th Cong., 2d Sess. (1986) (*"Senate Report"*); H.R.Rep. No. 855, 99th Cong., 2d Sess. (1986) (*"House Report"*).

Because individuals who are willing to conceal the source of illegal booty have become so necessary to the secrecy that organized-crime figures and drug dealers cherish, Congress decided to criminalize the laundering activity. *See Senate Report* at 2; *House Report* at 7–8. The statute was designed to create a new federal crime, rather than to further penalize the underlying criminal conduct. *See Senate Report* at 1–2; *House Report* at 7. In 1988, Congress added subsection (a)(3) to the money laundering statute. At that time, Senator Biden emphasized that the purpose of this amendment was to enhance the ability of law-enforcement officers "to obtain evidence necessary to convict *money launderers.*" 134 Cong.Rec., S 17365 (daily ed. Nov. 10, 1988) (statement of Sen. Biden)

1. The conspiracy statute, which contains two distinct clauses (the "offense" clause and the "conspiracy to defraud" clause) provides:
 If two or more persons conspire either [1] to commit any offense against the United States,

or [2] to defraud the United States, or any agency thereof in any manner or for any purpose, ... each shall be fined ... or imprisoned....
18 U.S.C. § 371.

(emphasis added). Thus, while not overwhelming, the legislative history supports our view that the essential nature of a conspiracy to violate Section 1956 is an agreement to launder money, regardless of which particular specified unlawful activity is the source.

Stavroulakis' final argument regarding the conspiracy charge is that, as a matter of law, *Rosenblatt* requires reversal. We reject this argument. In *Rosenblatt*, one of the conspirators, Brooks, made certain false entries in the books of his employer, the United States Postal Service, and, through this larcenous scheme, illegally obtained eight checks drawn on his employer's account. Brooks then gave the checks to Rosenblatt to launder them. Rosenblatt did not realize that the checks had been obtained by larceny; rather, he labored under the impression that Brooks wanted perfectly legal checks laundered either to evade the payees' income tax liability or to conceal kickbacks. Both were subsequently charged with conspiracy to defraud the United States. *See Rosenblatt,* 554 F.2d at 37–38. Brooks thereafter pleaded guilty, and Rosenblatt was convicted after a jury trial. *Id.* at 37. We reversed Rosenblatt's conviction on appeal. *Id.* at 38.

*Rosenblatt* is clearly inapposite. First, Rosenblatt and Brooks were charged under the inherently more amorphous "conspiracy to defraud" clause of the general conspiracy statute. *Id.* at 40–41. More importantly, in *Rosenblatt,* we noted that there was no charge or proof that the conspirators intended to commit the same type of fraud on the United States, i.e., Brooks' fraud involved unlawfully obtaining checks, whereas Rosenblatt's fraud involved, for the most part, tax evasion. Thus, there could have been no meeting of the minds between the conspirators. *Id.* at

40–42. Here, defendants were charged with conspiring to commit an offense against the United States. And, in sharp contrast to *Rosenblatt,* the evidence here was overwhelming that Stavroulakis and Giziakis agreed to commit the same offense, albeit with Giziakis having been duped as to an inconsequential detail.

■ Stavroulakis concedes that if we find that the particular specified unlawful activity is an ancillary aspect of a money laundering conspiracy, the conviction must stand.[2] We hold that the evidence established that defendant and his co-conspirator agreed on the essential nature of a scheme to launder money, and the conviction, therefore, is affirmed.

### Bank Fraud

Stavroulakis next argues that his convictions under Counts Two and Three must be reversed because the indictment failed to allege any scheme to defraud a federally chartered or insured bank. Alternatively, he argues that, even if the indictment were sufficient, the evidence at trial failed to establish such an offense. We reject both arguments.

At the time these offenses occurred, the bank fraud statute provided:

(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a federally chartered or insured financial institution;

(2) or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.

2. Stavroulakis asserts another argument that is without merit. He claims that the evidence was insufficient to establish that Maniquis had represented to Giziakis that the money was the proceeds of *illegal* gambling. New York criminal law controls whether the representations by Maniquis amounted to representations of illegal, felony-level gambling. *See* 18 U.S.C. § 1956(c)(7). New York law makes it a felony for an operator of a numbers game to receive

more than $500 a day which has been played or bet on numbers. *See* New York Penal Law § 225.10 (McKinney 1989). The evidence here was sufficient for the jury to find that Maniquis represented to Giziakis that the money came from felony-level gambling. Most notably, Maniquis told Giziakis that he and his associates grossed several hundred thousand dollars per month, and that they were prepared to make an initial monthly deposit of $30,000.

18 U.S.C. § 1344. The indictment charged Stavroulakis under subsection (a)(1). Counts Two and Three of the indictment alleged:

*Count Two:*

From on or about April 4, 1989, up to and including May 17, 1989, in the Southern District of New York, NICK STAVROULAKIS, the defendant, and others known and unknown to the grand jury, unlawfully, wilfully and knowingly attempted to execute a scheme and artifice to defraud a federally chartered and insured financial institution, to wit, the defendant and others negotiated to sell and sold to an undercover agent of the F.B.I. approximately 500 stolen Republic National Bank checks from the account of ESM General Merchandise, Ltd.

*Count Three:*

From on or about November 3, 1989, up to and including November 9, 1989, in the Southern District of New York, NICK STAVROULAKIS, the defendant, unlawfully, wilfully and knowingly attempted to execute a scheme and artifice to defraud a federally chartered and insured financial institution, to wit, the defendant negotiated to sell and sold to an undercover agent of the F.B.I. three stolen Bank Leumi checks from the account of Nature's Gift's II Produce, Inc.

■ An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events. *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962); *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). We have often stated that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Tramunti,* 513 F.2d at 1113; *see United States v. Bagaric,* 706 F.2d 42, 61 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *see also United States*

*v. Bailey,* 444 U.S. 394, 414, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980). We note the Supreme Court's caveat that when the definition of an offense includes " 'generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars.' " *Russell,* 369 U.S. at 765, 82 S.Ct. at 1047 (quoting *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1876)); *see also Rosenblatt,* 554 F.2d at 41.

The Federal Rules of Criminal Procedure encourage succinct criminal pleadings. *See* Fed.R.Crim.P. 7(c)(1); 1 Wright, Federal Practice and Procedure: Criminal 2d § 123 at 346–47 (1982). Certainly, precision and proper notice to the defendant cannot be sacrificed for the sake of brevity, but we have noted that common sense must control, and that "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Silverman,* 430 F.2d 106, 111 (2d Cir.), *modified,* 439 F.2d 1198 (2d Cir.1970), *cert. denied,* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971); *see United States v. Barbato,* 471 F.2d 918, 921 (1st Cir.1973). When an indictment delineates the elements of a charged offense, however concisely, the underlying concerns of proper pleading—notice of the charge to be met and protection against double jeopardy—may be further promoted by a bill of particulars or pre-trial discovery. *See United States v. McClean,* 528 F.2d 1250, 1257 (2d Cir.1976).

■ Counts Two and Three track the language of 18 U.S.C. § 1344(a)(1). The indictment charges an attempt to execute a scheme to defraud a federally chartered and insured financial institution, and it states the approximate time and place of the alleged acts. Each count further provides a brief explanation of how Stavroulakis attempted to execute the scheme: by selling stolen checks drawn on two federally chartered and insured banks. The government also provided significant pre-trial discovery to defendant.

Stavroulakis nevertheless contends that these counts of the indictment are "fatally defective" because, while they ostensibly charge a scheme to defraud a federally chartered and insured bank, they fail to allege any fraudulent conduct directed at a bank. We disagree.

Two major considerations emerge from the legislative history of the federal bank fraud statute. First, Congress expressed an intent to "protect[ ] the financial integrity of these institutions, and ... assure a basis for Federal prosecution of those who victimize these banks through fraudulent schemes." S.Rep. No. 225, 98th Cong., 2d Sess. 377 (1983), *reprinted in*, 1984 U.S.Code Cong. & Admin.News 3182, 3517; *see* H.R.Rep. No. 901, 98th Cong., 2d Sess. 2–6 (1984); *United States v. Blackmon*, 839 F.2d 900, 905–06 (2d Cir.1988). It was Congress' intent that a federally insured or chartered bank must be the actual or intended victim of the scheme. *See United States v. Morgenstern*, 933 F.2d 1108, 1112 (2d Cir.1991); *Blackmon*, 839 F.2d at 906.

Second, Congress modeled the bank fraud statute upon the mail and wire fraud statutes, indicating that it wanted the bank fraud statute to be just as broad as the mail and wire fraud statutes. *See* H.R.Rep. No. 901 at 4; *United States v. Bonallo*, 858 F.2d 1427, 1432–33 (9th Cir. 1988). Other circuits have refused to constrict the scope of the bank fraud statute, holding instead that it should be read broadly in light of its purpose. *See United States v. Matousek*, 894 F.2d 1012, 1014 (8th Cir.), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1832, 108 L.Ed.2d 961 (1990); *Bonallo*, 858 F.2d at 1432–33. We agree that the bank fraud statute should be read expansively and, where it dovetails with the mail and wire fraud statutes, we look to precedents arising under those statutes to inform our interpretation of such amorphous phrases as "scheme to defraud."

It has been observed that "[t]he term 'scheme to defraud' ... is not capable of precise definition." *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987). Wrestling with the term "to defraud," as it appears in the mail fraud statute, the Su-

preme Court stated that the words "commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.' " *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). Essential to a conviction under the "scheme to defraud" clause of the mail fraud statute is a showing of fraudulent intent: i.e., intent to deceive and intent to cause actual harm. *See United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987). Interpreting the "scheme to defraud" clause of the bank fraud statute, the Third Circuit, in *Goldblatt*, emphasized that "[t]he bank fraud statute condemns schemes designed to deceive in order to obtain something of value." *Goldblatt*, 813 F.2d at 624.

This much is clear: a conviction under the "scheme to defraud" clause of the bank fraud statute requires that the defendant engage in or attempt to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss. *See id.* It is worth emphasizing that the bank need not actually be victimized; the statute makes an individual criminally culpable for devising and executing or *attempting* to execute such a scheme with the intent to victimize the bank. *See United States v. Kelley*, 929 F.2d 582, 585 (10th Cir.) ("ultimate success or failure of the scheme is immaterial" to conviction for bank or mail fraud), *cert. denied*, —— U.S. ——, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991); *United States v. King*, 860 F.2d 54, 55 (2d Cir.1988) (per curiam) ("ultimate success" of scheme not necessary element of crime of mail fraud), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989).

■ Stavroulakis' principal argument is that by charging merely a sale of stolen checks, the indictment failed to allege a scheme that was intended to victimize a bank. We disagree. Common sense dic-

tates that by charging a scheme to traffic in stolen, blank checks, the indictment accused defendant of engaging in a course of intentionally deceptive conduct directed at the drawee bank. Blank checks are of no value unless and until they are passed through the drawee bank. And, to be passed, a forged signature of the drawer necessarily has to be affixed to a stolen, blank check. Inherent in a sale of stolen checks is that they will eventually be presented to the drawee bank for payment; and payment over a forged signature exposes the bank to real loss. In most forgery situations, the bank will be legally liable, and, as the testimony here indicated, even in a number of those situations where the bank is not legally liable for paying over a forged signature, the bank will often swallow the loss for the customer. Thus, the requisite nexus between the seller of the stolen checks and the drawee bank is established by the nature of the sale of the stolen checks.

We see no validity to the argument that stolen checks are of value to the thief in their pristine form solely because there is a nefarious market for them. The only reason such a market exists is that a purchaser of stolen checks will ultimately attempt to move them through the drawee bank. Only the most witless thief could believe that he was receiving several thousand dollars for stolen checks because the purchaser of such checks values the paper on which the checks are printed. Accordingly, we hold that the indictment here was sufficient to allege bank fraud.

■ Stavroulakis' next argument is that, assuming the indictment sufficiently charged bank fraud, the evidence at trial was insufficient to establish an intent to defraud either Republic National Bank or Bank Leumi. Again, we disagree.

Agent Maniquis testified that he explained to Stavroulakis that because the check-cashing establishment was bonded, only the drawee banks would suffer a loss when the checks were eventually negotiated. Furthermore, there is evidence in the record that defendant understood that the checks would eventually have to be forged and negotiated through the drawee bank. Specifically, Stavroulakis offered to provide Maniquis with a sample corporate signature of ESM, the account holder for the checks that were the subject of Count Two of the indictment. Also, defendant's compensation for selling Maniquis the checks was set at a percentage of the balance in each account. Thus, viewing the evidence in the light most favorable to the government, as we must, *see United States v. Torres*, 901 F.2d 205, 216 (2d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990), and drawing all reasonable inferences in favor of the jury's verdict, as we must, *see United States v. Zabare*, 871 F.2d 282, 286 (2d Cir.), *cert. denied*, 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989), we find that the evidence was sufficient to prove that defendant intended to defraud the drawee banks.

## Jury Selection

Stavroulakis next claims that he is entitled to a new trial because the prosecutor, during jury selection, exercised one of her peremptory challenges in a racially discriminatory manner. Specifically, he alleges that the district court erred by not allowing him to make out a prima facie case of discrimination and by basing its decision on an incorrect view of the applicable law. We disagree.

■ In the seminal case of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court adopted a three-pronged approach to determining whether peremptory challenges have been exercised in a racially discriminatory manner. First, the defendant has the burden of establishing a prima facie case of discrimination. *Batson*, 476 U.S. at 93–97, 106 S.Ct. at 1721–23. If the defendant satisfies this initial burden, the prosecution must then come forward with a race-neutral justification for the exercise of the challenge. *Id.* at 97–98, 106 S.Ct. at 1723–24. The trial court then is obliged to determine whether the defendant has carried his ultimate burden of establishing "purposeful discrimination." *Id.* at 98, 106 S.Ct. at 1724.

In the present case, the district court implicitly—and rather abruptly—determined that defendant had failed to establish a prima facie case of discrimination, i.e., to show that the circumstances raise an inference of discrimination. *Id.* at 96, 106 S.Ct. at 1723. Because a peremptory challenge initially requires no explanation, no "smoking gun" will usually be present; and a prima facie case of discrimination will be built on inferences. The *Batson* Court noted that these inferences may stem from, *inter alia,* a pattern of strikes or even from the style of the prosecutor's questions during *voir dire. Id.* at 97, 106 S.Ct. at 1723. However, because of the elusive nature of the inquiry, the Court wisely chose not to limit the possible sources of discriminatory inferences to just these two instances. Rather, it gave trial judges broad latitude to consider the totality of the circumstances when determining whether a defendant has raised an inference of discrimination. *Id.* at 97, 98 n. 21, 106 S.Ct. at 1723, 1724 n. 21.

 The sole reason Stavroulakis offered at trial to establish a prima facie case of discrimination was that the excused venireman, Eddie Holmes, was black. Reference merely to the race of one excused venireman, without more, is insufficient to raise an inference of discrimination. *See United States v. Lane,* 866 F.2d 103, 105–06 (4th Cir.1989); *United States v. Ingram,* 839 F.2d 1327, 1329–30 (8th Cir. 1988); *United States v. Lewis,* 837 F.2d 415, 417 (9th Cir.), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988). A member of any race can be the subject of a proper peremptory challenge. When other factors such as patterns of strikes or lines of questioning combine with race, the inference of discrimination may arise. *See Batson,* 476 U.S. at 96–97, 106 S.Ct. at 1723. Here, defendant offered no evidence of a pattern of peremptory challenges to black members of the venire; nor did he assert that any of the prosecutor's questions raised an inference of discrimination; nor did he suggest that any other circumstances raised such an inference.

Defense counsel argues that the district court prevented him from establishing his prima facie case by abruptly cutting him off and making a summary ruling on the objection. We too are concerned about the haste with which the district ruled, and, at oral argument, we afforded defense counsel an opportunity to set forth his prima facie case. However, appellate counsel articulated little else than that the excused venireman was black in attempting to persuade us that the prosecutor's peremptory challenge raised an inference of racial discrimination.

Stavroulakis also claims that because the excused venireman's responses during jury selection were similar to those of the other seated, white jurors, the inescapable inference is that the challenge was based solely on race. We find this argument flawed. Contrary to defendant's assertion, the answers given by Eddie Holmes during *voir dire* differed markedly from those given by the other members of the venire. Most notably, Holmes was unemployed and had worked "off and on" for a number of years as a maintenance worker. The others either maintained full-time employment or were retired from full-time jobs. Judge Griesa noted this distinction between Holmes and the others, stating that Holmes was not qualified to act on a complex case such as this one. This disparity between the answers of Holmes and the other panel members distinguishes this case from *United States v. Horsley,* 864 F.2d 1543 (11th Cir.1989), in which the Court found an inference of discrimination because the responses of the excused venireman "did not differ in substance from those provided by white jurors." *Id.* at 1544.

██ Finally, Stavroulakis argues that the district court applied an erroneous standard in ruling on this objection. In dispatching defense counsel's objection, the court stated, *inter alia:* "In the first place, your client is not black." Although Stavroulakis sees reversible error in this statement, we do not.

In *Batson,* the Supreme Court stated that a prima facie case of discrimination in

jury selection requires a showing that the defendant "is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (citation omitted). The Supreme Court has recently clarified this statement—after the district court ruled on the *Batson* question in this case—and it now holds that the defendant does not have to be of the same race as the excused juror to raise the Equal Protection argument. *Powers v. Ohio*, —— U.S. ——, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991). Although Judge Griesa can hardly be faulted for following the letter of *Batson*, and it would seem that we are obliged to apply *Powers* to this case, *see Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (*Batson* rule applicable to cases pending on direct appeal), we do not find the error to be reversible. It is clear that the district court independently determined that there was no inference of discrimination to support defendant's prima facie case, regardless of defendant's race. And, granting the requisite deference to this finding by the district court, we are unable to say that the court erred in finding no inference of discrimination.

*Judicial Recommendation Against Deportation*

Finally, Stavroulakis asserts that he was unconstitutionally denied a JRAD at sentencing. Again, we disagree. In November 1990, Congress repealed 18 U.S.C. § 1251(b)(2), which had provided district judges with the discretion, at sentencing, to make a JRAD. The Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978, 5050 (1990), stripped sentencing judges of their discretion to make JRADs for convictions entered before, on, or after November 29, 1990. Stavroulakis argues that since his offense occurred prior to the repeal of section 1251(b)(2), the repeal amounted to an *ex post facto* violation, by effectively increasing the punishment to which he was exposed. We need not address this constitutional claim, however, because it is clear that the district court, in the exercise of its discretion, would not have granted the application for a JRAD.

Prior to the repeal of section 1251(b)(2), the decision to grant a JRAD rested within the "absolute discretion" of the district court. *Haller v. Esperdy*, 397 F.2d 211, 213 (2d Cir.1968); *see Janvier v. United States*, 793 F.2d 449, 452 (2d Cir.1986). Here, the district court held that, assuming it had the authority to grant defendant's request for a JRAD, it would refuse to exercise that discretion because of the seriousness of defendant's crimes. Stavroulakis does not claim that this refusal was an abuse of discretion, and we can see no reason why it would be. Accordingly, because defendant would not have received the JRAD in any event, we need not address the *ex post facto* claim.

## CONCLUSION

We have considered defendant's other claims of error and find them to be without merit. For the reasons set forth above, we affirm both the convictions and the sentence. AFFIRMED.