**UNITED STATES of America**

v.

**Monya ELSON, Defendant.**

**No. 95 Cr. 179(JGK).**

United States District Court, S.D. New York.

June 16, 1997.

---

Mary Jo White, United States Attorney, Southern District of New York by Jeffrey M. Zimmerman Assistant United States Attorney, New York City, for Government.

James J. DiPietro, Joseph A. Gentile, Brooklyn, NY, for Defendant.

## OPINION AND ORDER

KOELTL, District Judge:

In March, 1995, a Grand Jury in the Southern District of New York returned a three count Indictment against the defendant, Monya Elson. The first two counts of the Indictment charge Elson with conducting and participating in, and conspiring to conduct and participate in, the conduct of an enterprise through a pattern of racketeering activity, in violation of Title 18 of the United States Code, Sections 1962(c) and (d) ("RICO"). The pattern of racketeering activity alleged in the Indictment included three murders and two attempted murders. The third count of the Indictment charges Elson with participating in a Hobbs Act extortion, in violation of Title 18, United States Code, Sections 1951 and 1952.

Elson has now made an omnibus motion in regard to this Indictment. Elson first seeks to transfer his prosecution to the Eastern District of New York, or, alternatively, to transfer only the homicide allegations to that district. Elson also moves to dismiss the racketeering counts in the Indictment, alleging that those charges are legally insufficient. Elson's motion also seeks to suppress the fruits of various court-authorized wiretaps. Finally, Elson seeks to strike from the Indictment allegedly unnecessary, superfluous and inherently prejudicial verbiage.[1]

## II.

Elson moves to transfer this case, or at least those portions of the case containing

---

1. Elson also originally sought a bill of particulars and this Court's intervention in various discovery issues. However, at oral argument, Elson informed the Court that the parties were resolving these issues and the Court's intervention was not required. The motions for a bill of particulars and for discovery are therefore withdrawn without prejudice.

the homicide allegations, to the Eastern District of New York.[2] "For the convenience of parties and witnesses, and in the interests of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district." Fed.R.Crim.P. 21(b). "The burden of setting forth facts sufficient to warrant transfer is, of course, on the moving party." *United States v. Persico*, 621 F.Supp. 842, 858 (S.D.N.Y.1985).

■ In deciding whether transfer is appropriate under Rule 21(b), courts generally consider the factors set forth in *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). These factors include the location of the defendant, the location of possible witnesses, where the events at issue occurred, the location of relevant documents, the location of defense counsel, the relative accessibility of the place of trial, the expenses to be incurred by the parties if the transfer is denied, the docket condition of each district, and any other special factors. *See United States v. Maldonado–Rivera*, 922 F.2d 934, 966 (2d Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *United States v. Keuylian*, 602 F.2d 1033, 1038 (2d Cir.1979); *United States v. Spy Factory Inc.*, 951 F.Supp. 450, 455–56 (S.D.N.Y.1997). A Court should weigh all of these factors and determine whether the interests of justice would be better served by changing the trial venue. *See Maldonado–Rivera*, 922 F.2d at 966.

■ Elson argues that the Eastern District of New York is a more convenient forum than the Southern District of New York because all of the actual murders and one of the attempted murders occurred in the Eastern District, the investigation of those crimes was conducted by detectives from a precinct in the Eastern District, and the defendant, the alleged victims, and the civilian witnesses all reside in the Eastern District. In response, the Government argues that the defendant is currently incarcerated in this district and that most of the relevant documents

are already in the Government's possession, and are stored in this district. The Government also argues that the Eastern District cannot be considered more convenient than the Southern District because the two districts are adjacent, and the courthouses are located only a few miles apart.

The Government is correct that given the proximity of the two courthouses, the defendant has failed to show that the factors bearing on convenience indicate that the interests of justice would be served by transfer. As the court stated in *United States v. Persico*, 621 F.Supp. 842 (S.D.N.Y.1985)

> When a racketeering case is properly venued in either of two adjacent districts ... it is difficult to imagine convenience interests that would compel transfer of the case. As between the two districts the situs of prosecution is generally a decision more properly within the province of the Attorney General than a federal district judge.

> Since the prosecution has already been brought here, the grand jury which heard evidence is located here, the government's attorneys are located here, and a large number of documents and other evidence accumulated by the government to support its charges are located here, it would be imprudent to transfer the case to [The Eastern District]. *Id.* at 858–59.

Given the proximity of the two courthouses, the defendant has failed to carry his burden of showing that the Eastern District would be a more convenient forum for this litigation. The defendant has also failed to show that the transfer is necessary to serve the interests of justice. All such a transfer would do is unnecessarily delay the trial, which has already been scheduled. *See id.* at 858.

In the alternative, Elson seeks to have the murder and attempted murder allegations, which are included in the racketeering charges, severed and transferred to the Eastern District. However, for the same reasons explained above, transfer to the

---

**2.** Elson has not argued that venue in this district is improper and it is clear that the Indictment properly alleges venue.

Eastern District of these charges is not justified based on considerations of convenience. Moreover, such severance would waste judicial resources, because it would lead to duplicative prosecutions. Thus, Elson's motion to transfer the entire prosecution to the Eastern District, or in the alternative to transfer only the murder and attempted murder allegations is denied.

## II.

Elson also moves to dismiss the first two counts of the Indictment as legally insufficient. Both counts allege that Elson "together with others known and unknown were members of a group known as 'Monya's Brigada' and constituted an 'enterprise' as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce. Monya's Brigada was an organized criminal group that operated in the Southern District of New York and elsewhere."

Count One further charges that Elson "and others known and unknown, being persons employed by and associated with the racketeering enterprise described above, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, willfully and knowingly combined, conspired, confederated and agreed together and with each other to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity. . . . It was part of the conspiracy that the defendant agreed to participate in the conduct of the enterprise's affairs by personally committing at least two of the acts of racketeering, set forth . . . below," in violation of 18 U.S.C. § 1962(d).

Count Two further charges that "[f]rom in or about August 1990 up to and including the date of the filing of this Indictment, in the Southern District of New York and elsewhere, [Elson], and others known and unknown to the Grand Jury, being a person[ ] employed by and associated with the enterprise described in . . . this Indictment, which enterprise was engaged in, and the activities

of which affected, interstate and foreign commerce, unlawfully, willfully and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity . . . by committing two or more acts of racketeering, as set forth in . . . this Indictment," in violation of 18 U.S.C. § 1962(c).

In seeking dismissal of these two counts, Elson argues that the Indictment fails both to identify adequately the membership of the conspiracy and does not demonstrate the nature of any agreement between the unidentified members of the conspiracy. Elson also asserts that the Government has failed to identify a true enterprise, but rather has "haphazardly put together a group of people without any continuity in terms of their purpose, planning, or functions." Elson asserts that if this Court does not dismiss these two counts, it should conduct a hearing to determine whether the Government's evidence regarding these counts is sufficient.

"An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992) (citing *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962)). Moreover, " 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *Stavroulakis,* (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 55, 46 L.Ed.2d 50 (1975)); *see also United States v. Dransfield,* 913 F.Supp. 702, 706 (E.D.N.Y. 1996).

In this case, Count One of the Indictment tracks the language of 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." It also tracks the language of 18 U.S.C. § 1962(c) which makes it unlawful "for any person employed by or associated with any

enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

Count One of the Indictment also identifies "Monya's Brigada" as an enterprise under 18 U.S.C. § 1961(4), defines sufficient acts of racketeering activity under 18 U.S.C. § 1961(1), and alleges a proper "pattern of racketeering activity" under 18 U.S.C. § 1961(5). Count One also alleges that Elson conspired with others, being employed by or associated with the racketeering enterprise, to conduct and participate in the conduct of the affairs of that enterprise through a pattern of racketeering activity. It alleges that Elson agreed to participate in the conduct of the enterprise's affairs by personally committing at least two acts of racketeering.

Count Two incorporates the relevant allegations of Count One and tracks the substantive language of 18 U.S.C. § 1962(c).

In addition to tracking the language of that statute, the Indictment is very specific in identifying the numerous acts of racketeering activity, including murder, attempted murder, extortion, and narcotics distribution, which are alleged to constitute the pattern of racketeering activity. The Indictment alleges all of the elements of the offenses charged in Counts One and Two which must be proved by the Government beyond a reasonable doubt for the jury to find Elson guilty of these crimes.

In his challenge to the sufficiency of the Indictment, Elson is not really challenging the specificity of the Indictment so much as the adequacy of the evidence upon which the Indictment is based. For example, Elson disputes, citing *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), whether the Government can demonstrate that he was involved in the operation or management of the enterprise. The defendant also disputes whether the Government will be able to show a legally sufficient "enterprise" or a "pattern of racketeering activity." However, it is well established that an Indictment that is valid on its face may not be dismissed on the ground that

it is based on inadequate or insufficient evidence. *See United States v. Williams*, 504 U.S. 36, 54, 112 S.Ct. 1735, 1745–46, 118 L.Ed.2d 352 (1992); *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974); *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Thus, at this stage in the proceedings, such a challenge to the sufficiency of the evidence does not provide a basis for dismissal of the Indictment or for holding a pre-trial hearing, because the Government is not required to demonstrate the sufficiency of its proof until the close of its case-in-chief at trial. *See United States v. Gambino*, 809 F.Supp. 1061, 1079 (S.D.N.Y. 1992); *United States v. Marchese*, 1991 WL 60338 *2 (S.D.N.Y. April 11, 1991). The motion to dismiss Counts One and Two of the Indictment is therefore denied.

### III.

Elson also moves to suppress all evidence obtained from the interception of certain telephone calls pursuant to a court-authorized wiretap. The facts relevant to this motion are as follows. In seeking a court order authorizing the interception of wire communications involving telephone number (718) 996–6247 ("the target telephone number"), the Government submitted the Affidavit of Joseph Massimi, a Special Agent with the Drug Enforcement Administration ("DEA"). Special Agent Massimi, in his Affidavit, explained the bases for concluding that probable cause existed to believe that the target telephone number was being used to facilitate violations of the narcotics laws and would continue to be used to commit those violations. (October 25, 1991 Affidavit of Joseph Massimi ("Massimi Aff."), attached at Defendant's Exhibit ("DX") G, at ¶ 2).

Special Agent Massimi's Affidavit states that as part of the DEA's investigation of a narcotics trafficking organization, an undercover DEA Agent ("UC") had made several purchases of heroin from Alexander Moysif and Yefim Kats. (Id. at ¶ 15). Moreover, according to Special Agent Massimi's Affidavit, a court-authorized wiretap of communi-

cations conducted over another telephone number, (718) 627–0809, had resulted in the interception of hundreds of conversations that discussed narcotics trafficking, conversations in which the traffickers used code names to refer to narcotics transactions. (Id. at ¶ 52). Special Agent Massimi's Affidavit further states that beginning in the middle of August, 1991, Moysif began to engage in telephone calls with a person who identified himself as "Dima," who the DEA later identified as David Podlog, and who used the target telephone. (Id. at ¶¶ 8, 62, 65).

During these conversations, according to Special Agent Massimi's Affidavit, Moysif and Podlog engaged in cryptic conversations in which they discussed meetings, deadlines and payments, conversations which Special Agent Massimi believed referred to drug transactions. (See e.g., id. at ¶ 162, 65, 76, 87, 94). Special Agent Massimi's Affidavit further states that during one of these conversations Moysif and Podlog used a code for narcotics trafficking. (Id. at ¶ 76). Moysif and Podlog, according to Special Agent Massimi's Affidavit, also referred to street numbers in their conversations after the UC and Moysif had agreed to use street numbers to refer to quantities of heroin. (Id. at ¶ 83). At the same time these telephone conversations were occurring, Special Agent Massimi's Affidavit states, Moysif was meeting with the UC and a Confidential Informant ("CI") to negotiate drug transactions and to actually engage in such transactions. (Id. at ¶¶ 71, 86). Special Agent Massimi's Affidavit states that calls to the target telephone number were coordinated with aspects of these narcotics transactions. (Id at ¶¶ 83–102).

In his Affidavit, Special Agent Massimi also set forth the other investigative techniques already used by the DEA, including the use of the UC and CI, and explained why other investigative procedures reasonably appeared unlikely to succeed. Special Agent Massimi stated that intensive physical surveillance or the use of search warrants would likely alert the subjects of the investigation that they were being monitored. (Id. at ¶ 110(a)). He further stated that telephone toll records and pen registers were insuffi-

cient because they could not show what the subjects discussed or who participated in the conversations. (Id. at ¶ 1110(b)). A grand jury would be ineffective, Special Agent Massimi stated, because the only persons with information about the alleged criminal enterprise were themselves members of the conspiracy. (Id. at ¶ 110(c)). Special Agent Massimi also stated that the UC was only of limited use because those engaged in narcotics trafficking protect themselves by not disclosing the details of their business to anyone outside their own operation. (Id. at ¶ 110(d)).

On October 25, 1991, the Honorable Robert P. Patterson authorized the interception of wire communications involving the target telephone number. (October 25, 1991 Order, attached to the Government's June 4, 1997 letter to this Court). On November 18, 1991, the Government informed Judge Patterson that on November 8, 1991 Podlog had left the country. (November 18, 1991 letter, attached as DX E).

On November 13, 1991, the Government suspended the interception of telephone calls, even though Judge Patterson's authorization for the wiretap did not expire until November 24, 1991. (November 18, 1991 letter, attached as DX E; June 4, 1997 Affirmation of Special Agent Louis Cardinali, attached to the Government's June 4, 1997 letter to this Court (Cardinali Aff.) at ¶ 4). The Government informed Judge Patterson that it was monitoring a pen register attached to the target telephone number, and would re-commence interceptions if the target returned, or if others began to use the telephone. (November 18, 1991 letter, attached as DX E; Cardinali Aff. at ¶ 4). On November 25, 1991, the Government informed Judge Patterson that, because the pen register revealed no further use of the target telephone number, interceptions had not been resumed. (November 25, 1991 Letter, attached as DX F; Cardinali Aff. at ¶ 4).

The tape recordings made pursuant to the October 25, 1991 order were sealed pursuant to an Application and Order signed by Judge Patterson on November 25, 1991. (November 25, 1991 Application and Order, attached to Government's Memorandum as Govern-

ment's Exhibit ("GX") 1). In that Application and Order, the Government once again represented to Judge Patterson that interceptions over the target telephone had been suspended on November 13, 1991.(Id.). On December 6, 1991, the Government applied for and received from Judge Patterson an Order authorizing the extension of the interception of conversations involving the target telephone number. (December 6, 1991 Order, attached at GX 2). The application was supported by an affidavit from Special Agent Massimi detailing the facts supporting probable cause for this extension. (December 6, 1991 Affidavit of Joseph Massimi, attached to the Government's June 4, 1997 letter to this Court).

Elson moves to suppress the evidence obtained from the court-authorized wiretaps of the target telephone number on three separate grounds. First, Elson argues that the Government failed to extend properly the original wiretap authorization. Second, Elson asserts that there was insufficient probable cause to support the wiretap. Finally, Elson argues that the Government failed to exhaust normal or alternative investigative procedures prior to seeking the wiretap.

Elson incorrectly argues that the Government failed to extend properly the original wiretap because the Government did not obtain extension of the original wiretap until after the expiration of the original wiretap on November 24, 1991. As Elson himself acknowledges, the Government secured a court-authorized extension on December 6, 1991, before the taping of the conversations Elson seeks to suppress. Moreover, the Government did not attempt to intercept and did not intercept any conversations over the target telephone number from the time the original wiretap expired until the extension was issued on December 6, 1991. (Cardinali Aff. at ¶ 4).

■■ "Nothing in Title III requires that the government secure extension orders prior to the expiration of the preceding order. Thus time gaps may exist between period of authorized surveillance, so long as the government turns off all listening devices during those gaps and the defendant does not suffer prejudice from the time gap." *United States v. Gambino*, 734 F.Supp. 1084, 1101 (S.D.N.Y.1990). In this case, as in *Gambino*, the Government did not intercept conversations during the gap between the expiration of the original authorization and the securing of the extension, and received a valid extension before the conversations Elson seeks to suppress were intercepted. Moreover, Elson has not demonstrated that he suffered prejudice from this gap. Therefore, there are no grounds to suppress the evidence produced by the wiretap because of the gap between the expiration of the original wiretap and the securing of the extension.[3]

■ Elson also asserts that the evidence obtained from the court-authorized wiretaps of the target telephone number must be suppressed because, during the gap between the expiration of the wiretap and the securing of the extension, the Government agents continued to monitor the target telephone number with a pen register that could be easily converted into a listening device. However, the evidence shows that the pen register was not used to intercept communications in the gap period prior to the extension of the court-authorization to intercept communications. The use of the pen register without interception of communications would not render inadmissible the interceptions obtained pursuant to the subsequently issued court order authorizing those interceptions. *See United States v. Love*, 859 F.Supp. 725, 732 (S.D.N.Y.), *aff'd*, 41 F.3d 1501 (2d Cir.1994); *United States v. Shnayderman*, 1993 WL 524782 *1 (E.D.Pa. December 17, 1993).[4]

---

**3.** Elson also argues that the failure to secure an extension before the expiration of the original wiretap violates New York State's wiretap statute. However, this wiretap was secured by federal agents pursuant to 18 U.S.C. § 2518 and therefore state law is inapplicable to this question. *See United States v. Hall*, 543 F.2d 1229, 1232 (9th Cir.1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977); *see also Gambino*, 734 F.Supp. at 1101.

**4.** Elson cites New York law in arguing that the use of the pen register was improper. However, as explained above, this question is clearly governed by federal and not state law. *See Love*, 859 F.Supp. at 732; *Shnayderman*, 1993 WL 524782 at *1.

Thus, the use of the pen register provides no grounds to suppress the evidence obtained from the court-authorized wiretaps of the target telephone number.

Elson also contends that there was insufficient probable cause to justify the wiretap authorized by Judge Patterson. A court can authorize a wiretap on the basis of facts submitted by the applicant showing that there was probable cause to believe "(a) that an individual was committing, had committed, or was about to commit and offense enumerated in 18 U.S.C. § 2516 ... (b) that particular communications concerning the offense would be obtained through such interception, and (c) that the facilities to be surveilled were being used or were about to be used in connection with the commission of such an offense." *United States v. Biaggi*, 853 F.2d 89, 95 (2d Cir.1988), cert. denied, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989) (internal citations omitted); see also 18 U.S.C. § 2518(3).

■ In deciding whether there was probable cause, the Court should make a practical common-sense determination based on the totality of the circumstances. *United States v. Wagner*, 989 F.2d 69, 71–72 (2d Cir.1993) (citing *Illinois v. Gates* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). "[A] reviewing court will defer to the issuing court's determination that there was probable cause as long as there existed a substantial basis for a magistrate or judge to conclude that a search would uncover evidence of wrong-doing." *Biaggi*, 853 F.2d at 95 (internal citations and quotations omitted); see also *Wagner*, 989 F.2d at 71–72.

■ Special Agent Massimi's Affidavit describes several purchases of narcotics that were made from Moysif. The Affidavit then describes the numerous telephone calls made to the target telephone number by Moysif to discuss meetings, deadlines and payments. In the Affidavit, Special Agent Massimi sets forth a substantial basis for believing that these conversations concerned the sale of narcotics, despite the absence of overt references to drugs. These conversations were followed by at least one additional purchase of narcotics by the UC from Moysif. (Massimi Aff. at ¶ 86). Special Agent Massimi's

Affidavit, considered in its entirely, provided a reasonable basis to believe drug transactions were occurring, that the target telephone number was being used in such transactions by the identified individuals, and that a wiretap of the target telephone number would intercept conversations regarding narcotics trafficking. Thus, especially given the deference afforded Judge Patterson's determination that probable cause existed, there are no grounds to suppress the evidence gained from this wiretap.

■ Finally, Elson seeks to suppress the tapes generated by the wiretap based on the Government's alleged failure to meet the requirements of 18 U.S.C. § 2518(1)(c). Section 2518(1)(c) requires, as a precondition for obtaining a wiretap authorization, that the Government sufficiently provide to the issuing judicial officer "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." To satisfy this requirement "there is no requirement 'that any particular investigative procedures be exhausted before a wiretap may be authorized.'" *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir.1987) (quoting *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983)).

■ In his Affidavit, Special Agent Massimi described the investigative techniques the Government had already employed and explained why electronic surveillance was required. Special Agent Massimi explained that the Government had already used an undercover agent, a confidential informant, physical surveillance and other forms of monitoring. Special Agent Massimi then detailed the problems with the use of other investigative techniques in the context of this investigation. The information Special Agent Massimi provided is similar to the showing other courts have found satisfies the requirements of 18 U.S.C. § 2518(1)(c).

For example, Special Agent Massimi explained that intensive physical surveillance or the use of search warrants would likely alert the subjects of the investigation that they were being monitored. See *Young*, 822 F.2d

at 1237; *United States v. Ruggiero,* 726 F.2d 913, 924 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). He further stated that telephone toll records and pen registers were insufficient because they could not show what the subjects discussed or who participated in the conversations. *See United States v. Torres,* 901 F.2d 205, 232 (2d Cir.1990), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *Young,* 822 F.2d at 1237. Massimi also stated that the UC was only of limited use because those engaged in narcotics trafficking protect themselves by not disclosing the details of their business to people outside their own operation. *See United States v. Puglisi,* 790 F.2d 240, 242 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986); *Ruggiero,* 726 F.2d at 924.

The information provided by Special Agent Massimi sufficiently described to the judicial officer authorizing the wiretap the investigative steps already used and adequately demonstrated the need for electronic surveillance. Moreover, Judge Keenan previously found that this very wiretap satisfied the requirements of 18 U.S.C. § 2518(1)(c). (*United States v. Podlog,* 92 Cr. 374(JFK), S.D.N.Y. January 21, 1993, attached as GX 3). Thus, the Government's wiretap application satisfied the requirements of 18 U.S.C. § 2518(1)(c), and Elson's motion to suppress the tapes on this ground, like the other two grounds discussed above, is denied.

## IV.

■ Finally, the defendant moves, pursuant to Federal Rule of Criminal Procedure 7(d), to strike the portions of the Indictment he alleges are prejudicial surplusage. Specifically, Elson moves to strike the references in the Indictment to "Monya's Brigada" and to his alleged aliases, specifically the use of the nickname "Kishinevsky."

"Motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990) (quoting *United States v. Napolitano,* 552 F.Supp. 465, 480

(S.D.N.Y.1982)). "'[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'" *Scarpa,* 913 F.2d at 1013 (quoting *United States v. DePalma,* 461 F.Supp. 778, 797 (S.D.N.Y.1978)) (alteration in original).

In this case, the Government asserts that the term "Monya's Brigada" is relevant to the charge because it identifies the RICO "enterprise" in which the defendant is alleged to have been involved. In addition, the Government argues that the reference to the alias "Kishinevsky" in the Indictment is appropriate because this alias will be used in the Government's proof at trial.

■ Courts have consistently refused to strike language in indictments that identified the name of the criminal enterprise, *see Scarpa,* 913 F.2d at 1013; *Napolitano,* 552 F.Supp. at 480, finding it relevant to proving charges brought under RICO. Similarly, aliases and nicknames should not be stricken from an Indictment when evidence regarding those aliases or nicknames will be presented to the jury at trial. *See United States v. Ianniello,* 621 F.Supp. 1455, 1479 (S.D.N.Y. 1985); *Persico,* 621 F.Supp. at 861. Thus, the references to "Monya's Brigada" and to Elson's alias, should not be stricken pursuant to Rule 7(d).

## CONCLUSION

The defendant's motion to transfer venue, or in the alternative to sever a portion of the Indictment and transfer prosecution of those charges is *denied.* The defendant's motion to dismiss Counts One and Two of the Indictment is *denied.* The defendant's motion to suppress tape recordings is *denied.* The defendant's motion to strikes alleged "surplusage" from the Indictment is *denied.*

**SO ORDERED.**