## UNITED STATES of America,

v.

Thomas M. RITTWEGER, Douglas C. Brandon, Robert S. Dehaven and Victor M. Wexler, a/k/a "Fat Boy", a/k/a "Screw", Defendants.

No. 02 CR. 122(JGK).

United States District Court, S.D. New York.

April 23, 2003.

R. Scott Thompson, Lowenstein Sandler Kohl Fisher & Boylan, Roseland, NJ, for Thomas M. Rittweger.

Jason L. Hargadon, Getty, Keyser & Mayo, L.L.P., Lexington, KY, William T. Ramsey, Nashville, TN, for Douglas C. Brandon

Jerome A. Ballarotto, Trenton, NJ, for Robert S. Dehaven.

Timothy J. Coleman, U.S. Atty., Criminal Div., New York, NY, for U.S.

### OPINION AND ORDER

KOELTL, District Judge.

The defendants in this case—Thomas M. Rittweger ("Rittweger"), Douglas C. Brandon ("Brandon"), Robert S. DeHaven ("DeHaven") and Victor M. Wexler ("Wexler")—were charged in a thirteen-count indictment on January 31, 2002. The Grand Jury returned a superseding indictment on April 9, 2003 (the "Superseding Indictment" or the "Indictment").[1] While Richard J. Blech ("Blech") was charged as a defendant in certain counts of the original indictment, he subsequently pleaded guilty to certain counts in that indictment, and was named as a coconspirator but not as a defendant in the superseding indictment. The First Count of the Indictment charges Rittweger and Brandon with conspiring with Blech and others known and unknown in violation of 18 U.S.C. § 371 to commit securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5; to commit wire fraud in violation of 18 U.S.C. §§ 1343, 1346; and to violate the Travel Act, 18 U.S.C. § 1952(a)(3). Counts Two through Four charge Rittweger and Brandon with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b–5, and 18 U.S.C. § 2. Counts Five through Eight charge Rittweger and Brandon with wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 2. Count Nine charges that Rittweger, DeHaven, and Wexler, together with Blech and other co-conspirators not charged in Count Nine, conspired, in violation of 18 U.S.C. § 371, to commit securities fraud, wire fraud, and violations of the Travel Act in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b–5, 18 U.S.C. §§ 1343, 1346, and 18 U.S.C. § 1952(a)(3). Counts Ten through Thirteen charge Rittweger, DeHaven, and Wexler with violations of the Travel Act, 18 U.S.C. §§ 1952(a)(3) and 2, in order to carry on commercial bribery in violation of Sections 180.00 and 180.05 of the New York Penal Code. The defendants have now filed numerous pretrial motions.

The Indictment alleges the following facts. Blech, a resident of France and a United States citizen, was at all relevant times the owner, President, Chief Executive Officer, and Chairman of the Board of Credit Bancorp, Ltd. ("CBL"), a group of related United States and foreign business organizations that purported to provide "financial engineering" and investment

1. The motions filed by the defendants were addressed to the original indictment. However, the Court will apply these motions to the superseding indictment subsequently returned by the Grand Jury.

services. (Ind.¶¶ 1–2.) CBL is headquartered in Geneva, Switzerland, and has offices in the United States and elsewhere, including Tom's River, New Jersey, San Diego, California, and Lexington, Kentucky. (Ind.¶ 1.) The Indictment alleges that Blech directed CBL's affairs from its Geneva headquarters and controlled numerous CBL bank and brokerage accounts in Europe and elsewhere. (Ind.¶ 2.)

Rittweger was at all relevant times a resident of New Jersey and an employee and agent of CBL. (Ind.¶ 3.) Rittweger managed the CBL office in New Jersey where he held the title of Managing Director for North America and had principal responsibility for CBL's marketing activities in the United States. (Ind.¶ 3.) At all relevant times, the Indictment alleges, Brandon was a resident of Kentucky and an employee, attorney, and agent of CBL. (Ind. ¶ 4.)

The Indictment alleges two schemes. Counts One through Eight allege the "First Scheme" and Counts Nine through Thirteen allege the "Second Scheme." The schemes constitute two distinct but related conspiracies.

As part of the First Scheme, the Indictment charges that from about 1996 through in or about 1999, Rittweger and Brandon, together with Blech and other co-conspirators, participated in a scheme to defraud CBL customers of at least $210,000,000 by fraudulently inducing them to invest cash, securities, and other assets in two CBL investment programs— the "CBL Insured Credit Facility" and the "CBL Insured Securities Strategy." (Ind. ¶ 5.) The investors did so in the expectation of receiving dividend payments and loans on favorable terms. (Ind.¶ 5.) However, the Indictment alleges, CBL was actually a Ponzi scheme in which proceeds of investments in the programs were paid to earlier investors to create the false impression that the investments were profitable in order to induce more people to invest with CBL. (Ind.¶ 5.)

The Indictment alleges that in furtherance of the First Scheme, Rittweger and Brandon, together with Blech and other co-conspirators, made and caused others to make false and misleading representations to prospective customers. (Ind.¶ 6.) The indictment alleges that Rittweger, Brandon, and Blech falsely represented that Brandon would serve as a trustee on behalf of those customers who invested in the CBL Insured Credit Facility and would hold the invested assets in custodial accounts under his control. (Ind.¶¶ 4, 6(a).) In fact, Rittweger, Brandon, and Blech knew that Brandon had neither control over the accounts in which the CBL customer assets were invested, nor the ability to fulfill his duties as trustee. (Ind.¶ 6(a).) Rittweger and Blech also represented that assets invested in the CBL Insured Securities Strategy would be used to invest in mutual funds and other investments, although they knew that a substantial portion of the investments were used instead to pay for unauthorized personal and business expenses. (Ind.¶ 6(b).)

The Indictment describes some of the ways in which Rittweger and Brandon, together with Blech and other co-conspirators, distributed and caused others to distribute written marketing materials concerning CBL and the CBL Insured Credit Facility. (Ind.¶ 7.) The marketing materials allegedly offered customers the opportunity to invest in custodial accounts controlled by Brandon in order to earn "custodial dividends" and to obtain loans on favorable terms. (Ind.¶ 7.) The marketing materials allegedly contained numerous false representations, including that CBL had paid custodial dividends to customers since approximately 1991, when the company had in fact only been in busi-

ness since approximately 1996: that CBL had conducted more than approximately $1,000,000,000 in financial transactions in approximately 1998, when in fact that representation vastly overstated the size of CBL's business; and that CBL made money through "riskless arbitrage" transactions conducted by foreign financial institutions although CBL did not make money in that way. (Ind.¶¶ 7(a), (b), (c).)

The Indictment alleges that Rittweger, Brandon, Blech, and other co-conspirators knowingly misrepresented to prospective CBL customers 1) that Brandon would act as a trustee on their behalf and would hold any assets that they invested in a custodial account; 2) that neither CBL nor Brandon would sell, margin, pledge as collateral or otherwise encumber any assets invested by the customer without authorization; and 3) that any assets invested would be returned upon the customer's request, so long as the customer's debt obligations were satisfied. (Ind.¶¶ 8–9.) The Indictment alleges that Rittweger, Blech, Brandon and other co-conspirators fraudulently induced approximately 80 customers to invest securities and other assets worth $200,000,000 in the CBL Insured Credit Facility through such misrepresentations. (Ind.¶ 10.)

As part of the First Scheme, the Indictment alleges specific facts about the way in which Rittweger, Brandon, and Blech fraudulently induced Stephen N. Joffe ("Joffe"), Wolf Partners LP ("Wolf Partners"), and Stephenson Equity Company ("Stephenson Equity") to invest assets in the CBL Insured Credit Facility. (Ind. ¶¶ 11–37.) Each of these entities or their representatives were solicited by CBL representatives acting at Rittweger's direction to invest securities in a CBL Insured Credit Facility. (Ind.¶¶ 13, 23, 32.) Each then executed a "Credit Facility Agreement" and a "Trust Engagement Letter" and deposited securities in an Insured Credit Facility. (Ind.¶¶ 14–15, 24–25, 34–35.)

The Indictment also alleges that Rittweger, Blech and other co-conspirators offered customers the opportunity to earn income by investing cash, securities, and other assets in the CBL Insured Securities Strategy. (Ind.¶¶ 38–42.) The Indictment alleges that Blech and Rittweger targeted individual investors including holders of individual retirement accounts ("IRAs") for the CBL Insured Securities Strategy. (Ind.¶ 38.) Rittweger, Blech and other co-conspirators allegedly knowingly falsely represented to potential customers, among other things, 1) that cash, securities, and other assets invested in the CBL Insured Securities Strategy would be held in investment advisory accounts; 2) that such assets would be held in segregated accounts and would earn fee income for the customers; and 3) that such assets would be invested in mutual funds and other investments. (Ind.¶¶ 39–40.) The Indictment charges that Rittweger and Blech caused approximately 100 customers to transfer at least $10,000,000 to bank accounts that they controlled, and that they used a substantial portion of these assets to pay unauthorized business and personal expenses. (Ind.¶ 41.) Rittweger and Blech also allegedly caused fictitious account statements to be sent to the CBL Insured Securities Strategy customers which falsely stated that their assets had been used to purchase shares in mutual funds and other investments. (Ind.¶ 42.)

The Second Scheme introduces the third and fourth defendants, DeHaven and Wexler. DeHaven, a resident of New Jersey, was an officer of Mitsui Trust Company ("Mitsui"), a Japanese financial institution with offices in New York, New York. (Ind. ¶¶ 53–54.) DeHaven worked in Mitsui's New York office and was responsible for Mitsui's participation in securities lending

transactions. (Ind. ¶ 54.) The Indictment alleges that DeHaven owed fiduciary and other duties of trust and honest services to Mitsui. (Ind. ¶ 54.) Defendant Wexler, a/k/a "Fat Boy", a/k/a "Screw", was a New Jersey resident and an agent of CBL. (Ind. ¶ 55.) The Indictment alleges that Wexler, a personal friend of DeHaven, referred potential customers to CBL in return for payments from CBL, and also managed a foreign exchange trading business affiliated with CBL. (Ind. ¶ 55.)

In the Second Scheme, Rittweger, De-Haven, Wexler, Blech and other co-conspirators allegedly participated in a scheme from in or about 1997 through 1999 to defraud customers by fraudulently inducing them to invest cash, securities, and other assets in the CBL Insured Credit Facility. (Ind. ¶ 56.) To do so, the conspirators allegedly made and caused others to make numerous false and misleading representations, including that Mitsui had invested securities worth approximately $50,000,000 or more with CBL when in fact, as Rittweger, DeHaven, Wexler, and Blech well knew, Mitsui had made no such investment. (Ind. ¶ 57.)

The Indictment alleges that in or about 1997, Wexler introduced Rittweger to De-Haven. (Ind. ¶ 58.) The Indictment then alleges that on or about October 29, 1997, Rittweger and Wexler met with DeHaven and other Mitsui representatives in Mitsui's New York office and solicited Mitsui to enter into an investment transaction with CBL. (Ind. ¶ 59.) The Indictment alleges that from in or about 1997 through 1999, Rittweger continued unsuccessfully attempting to convince Mitsui to enter into an investment transaction with CBL. (Ind. ¶ 59.)

The Indictment charges that in or about 1998, Rittweger asked DeHaven to make false and misleading statements to prospective CBL customers including state-

ments to the effect that Mitsui had entered into a large investment transaction with CBL in order to induce the customers to invest with CBL. (Ind. ¶ 60.) Rittweger, DeHaven, Wexler and Blech are alleged to have agreed to make secret payments to Wexler and DeHaven in exchange for De-Haven making such false and misleading statements. (Ind. ¶¶ 60, 62.) The Indictment charges that from in or about 1998 through 1999, Rittweger, DeHaven, Wexler, and Blech falsely represented to numerous prospective CBL customers that Mitsui had invested securities worth approximately $50,000,000 or more with CBL, and DeHaven served as a false reference for such customers and confirmed that the false statements were accurate. (Ind. ¶ 61.)

On February 6, 2003, Blech pleaded guilty to Counts Two, Three, and Six of the Indictment. All remaining defendants now move to sever Counts Nine through Thirteen on the ground that they are improperly joined pursuant to Federal Rule of Criminal Procedure 8(b). Alternatively, DeHaven, Brandon, and Wexler argue that Counts Nine through Thirteen should be severed under Rule 14 of the Federal Rules of Criminal Procedure because joinder is unfairly prejudicial. The remaining defendants make the following additional motions: Defendant Wexler moves to dismiss Counts Nine through Thirteen pursuant to Federal Rule of Criminal Procedure 7(c) on the ground that they are legally insufficient; to dismiss Count Nine on the ground that it is duplicitous pursuant to Federal Rule of Criminal Procedure 8(a) and that 18 U.S.C. § 1346 is unconstitutionally vague on its face or, alternatively, as applied in this case; to strike allegedly irrelevant and prejudicial aliases as surplusage from the indictment; and for a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. De-

fendant Rittweger moves for additional discovery, a request that Wexler joins. Defendant DeHaven moves to dismiss Counts Nine through Thirteen as legally insufficient pursuant to Rule 7(c); to dismiss Count Nine on the grounds that it is duplicitous pursuant to Rule 8(a); to dismiss Count Nine on the ground that it is unconstitutionally vague on its face or, alternatively, unconstitutional as applied in this case; for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7 and for additional discovery; and to require the Government to strike unnecessary surplusage from the Indictment. Finally, defendant Brandon moves for a bill of particulars pursuant to Rule 7(f).

Defendants Rittweger, DeHaven, and Wexler also move to suppress various tape recorded telephone conversations recorded by Mitsui (the "Mitsui Tapes") pursuant to 18 U.S.C. § 2511 and New York State law. The Court conducted an evidentiary hearing on the suppression motion on April 15–16, 2003. The Court addresses the suppression motion in a separate opinion issued today.

## I.

The defendants move to sever Counts Nine through Thirteen (the counts alleging the Second Scheme) from Counts One through Eight (those alleging events involved in the First Scheme) pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure. Federal Rule of Criminal Procedure 8(b) provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same

act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.[2]

The defendants argue that the Indictment charges two separate conspiracies—the First Scheme and the Second Scheme—and associated substantive crimes that are not sufficiently related to permit a joint trial of all claims.

 In a case such as this, where multiple defendants are charged in the same Indictment, Rule 8(b) governs any motion for severance. *See United States v. Turoff,* 853 F.2d 1037, 1043 (2d Cir. 1988). "Thus, multiple defendants may be charged and tried for multiple offenses only if the offenses are related pursuant to the test set forth in Rule 8(b), that is, only if the charged acts are part of a 'series of acts or transactions constituting ... offenses.'" *Id.* For joinder under Rule 8(b) to be permissible, the acts in which the defendants are alleged to have participated "must be unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Attanasio,* 870 F.2d 809, 815 (2d Cir. 1989) (internal quotation marks and citations omitted); *see also United States v. Reinhold,* 994 F.Supp. 194, 197 (S.D.N.Y. 1998); *United States v. Lech,* 161 F.R.D. 255, 256 (S.D.N.Y.1995). However, two separate transactions do not constitute a "series" within the meaning of Rule 8(b) "merely because they are of a similar character or involve one or more common participants." *Lech,* 161 F.R.D. at 256 (internal citation omitted).

**2.** The language of Rule 8 was amended, effective December 1, 2002 as part of the general restyling of the Federal Rules of Criminal Procedure to make them more easily understood and to make style and terminology consistent throughout the rules. The changes were intended to be stylistic only. *See* Adv. Comm. Notes to 2002 Amendments. Therefore, the cases interpreting Rule 8 prior to the amendment can be used to interpret the amended Rule.

█ The Courts of Appeals disagree over whether Rule 8(b) severance motions should be decided solely on the basis of the allegations in the Indictment or instead may be decided on the basis of pretrial representations made by the Government. *See United States v. Gallo*, 98 Cr. 338, 1999 WL 9848, at *2 (S.D.N.Y. Jan.11, 1999) (collecting cases). In the context of a motion for severance under Rule 8(a), the Court of Appeals for the Second Circuit has approved a trial court's reliance in part "on the Government's representation." *See United States v. Ajlouny*, 629 F.2d 830, 842 (2d Cir.1980). However, the Court of Appeals for the Second Circuit has not ruled on this issue in the context of joinder under Rule 8(b), and Rule 8(b), unlike Rule 8(a), specifically turns on what is "alleged" against the defendants. In any event, on the face of the Indictment, in this case, the allegations are properly joined because there is both "substantial identity of facts or participants" in the First and Second Schemes, and both Counts One through Eight, and Counts Nine through Thirteen "arise out of a common plan or scheme." *Attanasio*, 870 F.2d at 815.

The defendants argue that the fact that Brandon is not named in Counts Nine through Thirteen of the Indictment, and that Wexler and DeHaven are only named in those counts, is evidence that Counts Nine through Thirteen should be severed. However, this argument ignores the fact that Rittweger and Blech were common participants in both the First and Second Schemes. The allegations in the Indictment allege that both Rittweger and Blech, senior officials of CBL, were key participants throughout both schemes. This important overlap of two out of the five named participants demonstrates a substantial identity of participants in the two sets of counts and supports joinder. *See id.*

Moreover, the actions alleged in Counts One through Eight and Counts Nine through Thirteen demonstrates a substantial identity of facts and clearly arise out of a common plan or scheme. Both the First and Second Schemes were efforts, at least in part, fraudulently to induce CBL customers to invest in the CBL Insured Credit Facility. Both Schemes occurred at approximately the same time. This is not a case in which distinct conspiracies are improperly charged in one indictment. *Cf. United States v. Gallo*, No. 98 CR. 338, 1999 WL 9848, at *3–*4 (S.D.N.Y. Jan.11, 1999) (finding two distinct conspiracies that were improperly joined); *Lech*, 161 F.R.D. at 255–58 (describing three distinct and improperly joined schemes).

Furthermore, at trial, evidence of both conspiracies and both sets of charges would be admissible as background evidence. *See United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir.1991). Evidence of both conspiracies could also be used pursuant to Fed.R.Evid. 404(b) to establish knowledge and intent in creating the fraudulent transactions on the part of Rittweger, who is charged in both schemes. *See Attanasio*, 870 F.2d at 815.

█ Nor is there a basis to grant a severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 provides, in relevant part, that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." [3] The Su-

---

**3.** Rule 14 was amended effective December 1, 2002 as part of the general restyling of the Criminal Rules. It was not intended to effect any substantive change and therefore cases

preme Court teaches that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). There is a preference for joint trials in the federal system for defendants who are indicted together. Joint trials promote efficiency and promote the interests of justice, by, among other means, avoiding inconsistent verdicts. *Id.* at 537, 113 S.Ct. 933. Thus, a defendant seeking such a severance "must show that he [will be] so severely prejudiced by the joinder as to [be] denied a fair trial, not that he might have [ ] a better chance for acquittal at a separate trial." *United States v. Torres*, 901 F.2d 205, 230 (2d Cir.1990) (citations and internal quotation marks omitted).

■ A danger of "prejudicial spillover," where evidence which would be inadmissible against one defendant if tried individually could be introduced in a joint trial, could provide a basis for a severance. Hence, a severance could be warranted where "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that defendant was guilty." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933 (citing *Kotteakos v. United States*, 328 U.S. 750, 774–775, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). However, claims of prejudicial spillover rarely succeed, particularly in the context of conspiracy cases because the evidence could be admitted in the separate trials. *See United States v. Muyet*, 945 F.Supp. 586, 596 (S.D.N.Y.1996); *see also United States v. Haynes*, 16 F.3d 29, 32 (2d Cir.1994);

interpreting the prior Rule remain instructive. *See* Adv. Comm. Notes to 2002 Amendments;

*United States v. Szur*, 97 Cr. 108, 1998 WL 132942, at \*12–\*13 (S.D.N.Y. March 20, 1998), *aff'd*, 289 F.3d 200 (2d Cir.2002).

■ Wexler and DeHaven argue that they would be unfairly prejudiced in defending against the charges in Counts Nine through Thirteen of the Indictment if evidence of the first eight counts were admitted at trial. The defendants argue that a jury would be unable to follow limiting instructions regarding separation of the acts charged in Counts One through Eight from those charged in Counts Nine through Thirteen. However, "[t]his case simply is not one where 'the risk that the jury will not, or cannot, follow instructions is so great ... that the practical and human limitations of the jury system cannot be ignored.'" *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir.1991) (quoting *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). There is no reason to believe that the jury cannot judge those acts and defendants charged in Counts Nine through Thirteen independently of the allegations that they will consider in connection with Counts One through Eight.

Brandon argues under Rule 14 that the Court should sever Counts Nine through Thirteen and grant him a trial on Counts One through Eight wholly separate from the other defendants. First, Brandon argues that there is no evidence linking him to the Second Scheme and thus he will be unfairly prejudiced by evidence at trial supporting the commercial bribery aspect of Counts Nine through Thirteen. Second, Brandon also claims that he cannot receive a fair trial if tried with the other codefendants on Counts One through Eight because the Indictment makes no specific

*see also* n. 2 *supra.*

reference to him with regard to the CBL Insured Securities Strategy. Specifically, Brandon alleges that because the CBL Insured Securities Strategy targeted holders of Individual Retirement Accounts as potential investors, the evidence at trial supporting this allegation would be emotionally charged and would subject him to unfair prejudice.

Brandon's arguments are without merit. Evidence of the conspiracy alleged in Counts Nine through Thirteen would be admissible at a trial against Brandon as background evidence for the conspiracy charged in Counts One through Eight. *See Coonan,* 938 F.2d at 1561. Moreover, Brandon's argument that he would be tainted by inflammatory evidence put on to prove the allegations regarding the defendants' efforts to defraud persons holding retirement accounts is unpersuasive. There is no reason to believe that a jury would be unfairly prejudiced by such evidence or would be unable to follow a limiting instruction regarding the counts with which Brandon is and is not charged. While it is true that the Indictment alleges that the CBL Insured Securities Strategy targeted individual investors, including holders of individual retirement accounts, this fraud was not so different from the remainder of the fraudulent scheme involving the CBL Insured Credit Facility in which Brandon is specifically identified in the Indictment. (*See* Ind. ¶ 38.) The CBL Insured Securities Strategy, like the CBL Insured Credit Facility Scheme, was alleged to be a massive fraudulent scheme perpetrated through deliberate misrepresentations. The Indictment alleges that approximately 100 customers transferred at least approximately $10,000,000 to bank accounts controlled by Blech and Rittweger in connection with the CBL Insured Securities Strategy. (*See* Ind. ¶ 41.)

All of the motions pursuant to Rule 14 ignore the interrelated nature of the allegations in this case. Furthermore, this is not a case where any defendant faces the prospect of the admissibility of evidence at trial which is a significantly different kind from the evidence otherwise admissible against that defendant. The common allegations against the various defendants have the common aspect of a massive securities fraud and do not include inflammatory allegations of significantly different kinds of crimes. This is not a case in which there is any reasonable possibility that the jury could not follow instructions and consider the evidence against each defendant without bias or prejudice.

For the reasons explained, the motions pursuant to Rules 8(b) and 14 are denied.

## II.

Wexler, joined by DeHaven, moves to dismiss Counts Nine through Thirteen on the ground that they are legally insufficient. Counts Nine through Thirteen of the original Indictment set forth, in substance, allegations of conspiracy to commit securities fraud, wire fraud, and violations of the Travel Act, as well as alleged substantive violations of the Travel Act, by the uses of interstate commerce facilities to promote, carry on and facilitate the promotion and carrying on of an unlawful activity, namely commercial bribery, in violation of Article 180 of the New York Penal Law, and subsequent acts to promote, carry on and facilitate the promotion and carrying on of that unlawful activity. Article 18 of the New York Penal Law includes the provisions of the Penal Law relating to "Bribery Not Involving Public Servants, and Related Offenses." The original indictment did not specify which sections of Article 180 were the "unlawful activity" that was involved in the substantive Travel Act violations and was part of

the object of the conspiracy involving a violation of the Travel Act. However, after oral argument on the current motions, the Government sought a superseding Indictment from the Grand Jury, which the Grand Jury returned on April 9, 2003. As noted above, the Court will apply the defendants' motions to the superseding Indictment. The superseding Indictment charges that:

> On or about the dates set forth below, in the Southern District of New York and elsewhere, the defendants set forth below, unlawfully, willfully and knowingly, traveled in interstate and foreign commerce, and used the mail and facilities in interstate and foreign commerce, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, commercial bribery, in violation of New York Penal Law, Sections 180.00 and 180.05, and thereafter performed and attempted to perform acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activity....

(Ind.¶ 70.) Section 180.00 of the N.Y. Penal Law prohibits "Commercial bribing in the second degree." Section 180.05 of the N.Y. Penal Law prohibits "Commercial bribe receiving in the second degree." The specific following counts, Counts Ten through Thirteen, then list the specific defendants charged, namely Rittweger, Dehaven, and Wexler, together with the date, the travel or use of a facility, and the subsequent act. The Conspiracy charged in Count Nine contains a description similar to Paragraph 70 in describing the violation of the Travel Act that was one of the objects of the conspiracy. (*See* Ind. ¶ 66.)

Federal Rule of Criminal Procedure 7(c)(1) provides that an Indictment "shall be a plain, concise and definite statement of the essential facts constituting the offense charged." [4] "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of facts." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.1992) (citing *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). Moreover, " 'an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *Id.* (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)). The Court of Appeals for the Second Circuit has also noted that " '[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made.' " *Id.* (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir.1970)).

In this case, Counts Nine through Thirteen track the language of the Travel Act, 18 U.S.C. § 1952(a)(3), which makes it unlawful to:

> travel[ ] in interstate or foreign commerce or use[ ] the mail or any facility in interstate commerce, with intent to—(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter perform[ ] or attempt[ ] to perform— (A) an act described in paragraph ... (3)....

In addition to tracking the language of the statute, the various substantive counts detail the specific use by the defendants of

---

4. The December, 2002 Amendments to the Criminal Rules did not change this language.

the facilities of interstate commerce to promote, manage, establish, carry on, and facilitate the violation of New York Penal Law §§ 180.00 and 180.05, including the dates and nature of those acts, such as making telephone calls and sending facsimiles. The Indictment also sets forth detailed allegations concerning specific subsequent acts in furtherance of the unlawful activity.

It is plain that Counts Nine through Thirteen satisfy the well-established pleading requirements in this Circuit—they are pleaded in the language of the statutes and provide sufficient particulars to provide notice to the defendants and to permit the defendants to plead double jeopardy. The Indictment is sufficiently particular, and indeed, far more general allegations have been found sufficient. *See, e.g., United States v. Covino,* 837 F.2d 65, 69–70 (2d Cir.1988) (Travel Act indictment). Accordingly, the defendants' motion to dismiss Counts Nine through Thirteen is denied.[5]

■ Wexler, joined by DeHaven, also argues that Count Nine should be dismissed because it insufficiently alleges the dates of the offense. The charging paragraph of Count Nine alleges a conspiracy to commit securities fraud, wire fraud, and to violate the Travel Act "[f]rom in or about 1996, up to and including in or about 1999." (Ind.¶ 63.) Wexler contends that the conspiracy could not have started until in or about 1998, at the earliest, when Rittweger allegedly asked DeHaven to make false or misleading statements to prospective CBL customers, including statements that Mitsui had entered into a large investment transaction with CBL. (Ind.¶ 60.) Wexler argues that although the sufficiency of the evidence is generally an issue left for trial and is generally not a ground for dismissing an indictment, in this case there is no evidence supporting the allegation that the conspiracy alleged in Count Nine existed prior to 1998 and thus Count Nine should be dismissed.

Wexler's argument is belied by the fact that the Grand Jury clearly found sufficient evidence to charge a conspiracy from in or about 1996 through in or about 1999, and the Government contends that it will prove this at trial. The Government is not required to prove that the conspiracy alleged in Count Nine began at the exact time stated in the Indictment so long as dates reasonably close in time are proven. *See United States v. Teague,* 93 F.3d 81, 84 (2d Cir.1996) (indictment date only needs to be substantially similar to date proved at trial); *United States v. Patino,* 962 F.2d 263, 266 (2d Cir.1992) ("when 'on or about' language is used in an indictment, the government is not required to prove the exact date stated, so long as a date reasonably close in time is proved and the specific time of the offense is not an essential element of the offense charged") (quoting *United States v. Nersesian,* 824 F.2d 1294, 1323 (2d Cir.1987)); *United*

5. Wexler also argues that Count Nine should be dismissed because it insufficiently informs him of his role in the alleged conspiracy, specifically whether he is alleged to have offered or received a bribe in connection with the Travel Act and commercial bribery allegations. However, the Indictment is sufficiently detailed to inform Wexler of the charges against him and to allow him to prepare for trial. This Court previously rejected this precise argument. *See Szur,* 1998 WL 132942, at *3–*5. Wexler had also argued that the reference in the original Indictment to Article 180 of the N.Y. Penal Law was too imprecise, but this argument was resolved when the superceding indictment specifically identified §§ 180.00 and 180.05 of the N.Y. Penal Law. These references are identical to the New York Penal Law provisions charged in the Indictment in *Szur* and are sufficiently particular that the Court will be able to charge the jury in this case concerning the elements of the unlawful activity that is the object of the Travel Act violations.

*States v. Matos–Peralta*, 691 F.Supp. 780, 791 (S.D.N.Y.1988) ("the government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme"). Moreover, it is possible that the conspiracy began prior to Rittweger's alleged solicitation of DeHaven, and there are overt acts charged in the Indictment as occurring prior to 1998, including a meeting between Ritwegger, Wexler, DeHaven, and other Mitsui representatives in October 1997, and the delivery of a letter by Rittweger to Mitsui in November 1997. (Ind.¶¶ 68(a)-(b).)

▇▇▇ Furthermore, it is well established that an indictment that is valid on its face, as is the Indictment in this case, may not be dismissed on the ground that it is based on inadequate or insufficient evidence. *See United States v. Williams*, 504 U.S. 36, 54, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992); *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir.1989). Thus, at this stage in the proceedings, such a challenge to the sufficiency of the evidence to support Count Nine does not provide a basis for dismissal because the Government is not required to demonstrate the sufficiency of its proof until the close of its case-in-chief at trial. *See United States v. Elson*, 968 F.Supp. 900, 905 (S.D.N.Y. 1997); *United States v. Gambino*, 809 F.Supp. 1061, 1079 (S.D.N.Y.1992); *United States v. Marchese*, No. S7 89 Cr. 229, 1991 WL 60338, at *2 (S.D.N.Y. Apr.11, 1991). The motion to dismiss Count Nine for insufficiently alleging the dates of the conspiracy is denied.

### III.

▇▇▇ Wexler argues that Count Nine is duplicitous and should be dismissed because it charges two separate conspiracies in a single count of the Indictment. "An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed.R.Crim.P. 8(a)'s requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir.2001) (internal citation omitted); *see also United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir.1981). Specifically, Wexler argues that Count Nine alleges both the conspiracy charged in Count One of the Indictment in addition to the conspiracy charged in Count Nine.

First, Wexler is wrong in alleging that the same conspiracy from Count One is simply realleged through incorporation in Count Nine. Count Nine does reallege many of the allegations contained in the First Count. However, the paragraphs realleged, paragraphs 1–42 and 46–47, contain factual allegations that are relevant to Count Nine. The specific charging language of the conspiracy charged in Count One are contained in paragraphs 43–45 of the Indictment and those paragraphs are not realleged in Count Nine.

Second, the conspiracies alleged in Counts One and Nine, while related, are distinct. The conspiracy alleged in Count One was a conspiracy among Blech, Rittweger, Brandon, and other unnamed co-conspirators to commit securities fraud and wire fraud from about 1996 through about 1999. The scheme to defraud customers of CBL consisted of inducing them to invest in two investment programs—the CBL Insured Credit Facility and the CBL Insured Securities Strategy. At the heart of the scheme were fraudulent representations that Brandon would act as a trustee on behalf of customers who invested in the Insured Credit Facility and would hold their invested assets in custodial accounts

under his control. The Indictment also charges in Count One that Rittweger, Blech, and other co-conspirators targeted individual investors, including holders of IRAs, with offers to invest in the CBL Insured Securities Strategy.

The conspiracy alleged in Count Nine is related yet distinct. Count Nine alleges a conspiracy to commit securities fraud, wire fraud, and to violate the Travel Act on the part of Rittweger, DeHaven, Wexler, Blech, and other unnamed co-conspirators from in or about 1996 through in or about 1999. An important part of this conspiracy were false representations by DeHaven and others to prospective customers that Mitsui had invested securities worth approximately $50,000,000 or more in CBL. An object of the conspiracy was wire fraud pursuant to which there was a scheme or artifice, among other things, to: deprive Mitsui of the intangible right to DeHaven's honest services, violate DeHaven's fiduciary and other duties to Mitsui, and obtain Mitsui's money and property. (Ind.¶ 65.) The Indictment also alleges an unsuccessful attempt by Rittweger and Wexler to convince Mitsui to enter into an investment transaction with CBL. (Ind.¶ 59.)

The conspiracies alleged in Counts One and Nine are distinct. Moreover, the specific conspiracy alleged in the First Count of the Indictment is not realleged in Count Nine, and only the factual allegations contained in the First Count are realleged. Because Count Nine is not duplicitous, the motion to dismiss is denied.

## IV.

Wexler, joined by DeHaven, argues that Count Nine should be dismissed on the ground that 18 U.S.C. § 1346 is unconstitutionally vague on its face or as applied. Specifically, Wexler challenges the allegation in the Indictment that the conspira-tors deprived Mitsui of the intangible right to DeHaven's honest services. (Ind.¶ 65.)

Section 1346 of Title 18, United States Code, provides that the term "scheme or artifice to defraud" as used in the mail and wire fraud statutes includes "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Congress passed this provision in 1988 in response to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which had held that the plain language of the mail and wire fraud statutes that were applicable at the time did not allow for criminal convictions for such schemes. The Supreme Court concluded that schemes to deprive another of the intangible right of honest services were not prohibited, unless Congress explicitly criminalized such conduct. *See id.* at 360, 107 S.Ct. 2875 ("If Congress desires to go further, it must speak more clearly than it has.") Congress subsequently passed § 1346.

Wexler argues that § 1346 is unconstitutionally vague on its face and as applied to the conduct charged in this case. However, Wexler concedes that the Court of Appeals for the Second Circuit has affirmed convictions under § 1346, where, as here, the defendants had allegedly devised or intended to devise a scheme or artifice to defraud an employer or principal of the intangible right of honest services of an employee or agent, in circumstances where the actionable duty arose from tort rather than contract. *United States v. Rybicki*, 287 F.3d 257, 264 (2d Cir.2002); *United States v. Middlemiss*, 217 F.3d 112, 119–120 (2d Cir.2000) (upholding conviction for mail fraud involving a scheme that deprived the defendant's employer of "all the services that a totally faithful employee would have provided" and in furtherance of which the defendant acted contrary to

the best interests of his employer); *United States v. Sancho,* 157 F.3d 918 (2d Cir. 1998) (per curiam) (upholding conviction for wire fraud, where the defendant agreed to pay an undercover agent who the defendant believed was a consultant for a company to give false information to the company and to refrain from disclosing any conflict of interest); *see Szur,* 289 F.3d at 209 n. 5; *United States v. Viertel,* 01 Cr. 571, 2002 WL 1560805, at *6–*8 (S.D.N.Y. July 15, 2002); *cf. United States v. Handakas,* 286 F.3d 92, 107 (2d Cir.2002) (finding that § 1346 was unconstitutionally vague as applied to a conviction in which the sole basis for the alleged intangible right of honest services was based on a contract). Although the Court of Appeals has granted rehearing en banc in *Rybicki, Rybicki, Middlemiss, Sancho* and *Szur* remain the law in this Circuit and teach that § 1346 is constitutional on its face and as applied to the alleged facts in this case.

## V.

Defendants Wexler, Brandon, and DeHaven move for bills of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. The defendants contend that they require more detailed information about the charges in the Indictment in order to prepare for trial. Brandon seeks a bill of particulars as to 1) the names of all presently unnamed co-conspirators in Count One and the approximate date that they are alleged to have joined the conspiracy charged in that count; and 2) the identities of the customers who were allegedly defrauded in Count One excluding those three specifically named in the Indictment. Wexler, joined by DeHaven, seeks to have the Government provide an exhaustive list of particulars. He summarizes the list as asking the Government to 1) specify the date, time, place, participants, and amount or value of the benefit conferred on Wexler and DeHaven; and 2) specify the understanding as to how this benefit would influence DeHaven's conduct in relation to his position at Mitsui. Wexler also asks the Government to identify the unnamed co-conspirators and the unnamed victims of the defendants' schemes.

The decision whether to grant a bill of particulars pursuant to Rule 7(f) rests with the sound discretion of the district court. *See United States v. Cephas,* 937 F.2d 816, 823 (2d Cir.1991); *United States v. Panza,* 750 F.2d 1141 (2d Cir. 1984); *United States v. Strawberry,* 892 F.Supp. 519, 526 (S.D.N.Y.1995). The purpose of a bill of particulars is to enable a defendant "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987). A bill of particulars is required "only when the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres,* 901 F.2d at 234 (citation omitted); *see also Cephas,* 937 F.2d at 823; *Panza,* 750 F.2d at 1148. The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories. *See United States v. Mitlof,* 165 F.Supp.2d 558, 569 (S.D.N.Y. 2001) (collecting cases); *see also Szur,* 1998 WL 132942, at *11. "Generally, if the information sought by the defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky,* 820 F.2d at 574; *see United States v. Barnes,* 158 F.3d 662, 665 (2d Cir.1998).

■ The defendants are not entitled to the particulars they seek. There is no need to provide a list of all unindicted co-conspirators. *See United States v. Trippe,* No. 00 Cr. 585, 2001 WL 434849, at \*7–\*8 (S.D.N.Y. Apr. 27, 2001) (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases); *Viertel,* 2002 WL 1560805, at \*12 (same). To the extent that the defendants' request for the identities of unnamed co-conspirators is really a request for a list of the witnesses that the Government intends to call at trial, the defendants are not entitled to such a list because they have not made the necessary specific showing of need. *See United States v. Jones,* No. 00 Cr. 182, 2000 WL 1448640, at \*3 (S.D.N.Y. Sept.28, 2000) (collecting cases); *Gallo,* 1999 WL 9848, at \*5.

Brandon also seeks identification of all victims of the conspiracy alleged in Counts One through Eight of the Indictment.[6] The Government has identified three primary victims, namely Joffe, Wolf Partners, and Stephenson Equity. Moreover, the Indictment clearly alleges that all CBL customers were victims of the alleged Ponzi scheme. Thus there is no risk that the defendants would be surprised by which CBL customers were allegedly victims of the First or Second Schemes. *Cf. United States v. Davidoff,* 845 F.2d 1151, 1152–55 (2d Cir.1988) Moreover, the defendants have received discovery in this case, such as Credit Facility Agreements, Trust Engagement Letters, and other agreements between CBL and its customers that the defendants can use to determine the al-

leged victims of the conspiracies charged in the Indictment. (Affirmation of Timothy J. Coleman dated March 13, 2003 ("Coleman Aff.") ¶ 5.) The defendants are not entitled to a bill of particulars listing the alleged victims.

Nor is Wexler entitled to a bill of particulars on the myriad other requests he has put forth. The Indictment is sufficiently detailed and the discovery has been extensive so that a bill of particulars is not necessary to accomplish the appropriate goals of a bill of particulars. For example, the Indictment clearly alleges that DeHaven agreed to make false and misleading statements to prospective CBL customers to the effect that Mitsui had invested approximately $50,000,000 with CBL in order to induce customers to invest with CBL. (Ind.¶¶ 60–62.) The Indictment alleges that Rittweger, DeHaven, Wexler and Blech caused prospective customers to contact DeHaven to confirm that statements about Mitsui's alleged investment in CBL were true. (Ind.¶ 61.) In exchange for DeHaven confirming such false statements, Rittweger, DeHaven, Wexler and Blech allegedly agreed that Wexler and DeHaven would receive secret payments. (Ind.¶ 60.) Moreover, paragraph 68 of the Indictment lists specific overt acts, including dates, locations, participants and other information, that are part of the conspiracy charge and paragraphs 69 and 70 list the detailed allegations supporting the substantive Travel Act allegations.

Wexler's requests are merely "an impermissible attempt to compel the Government to provide the evidentiary details of its case." *United States v. Biaggi,* 675 F.Supp. 790, 810 (S.D.N.Y.1987). The Government is not required to provide the defendants every detail of its case before

---

**6.** Wexler seeks a bill of particulars identifying the CBL customers and prospective customers referenced in paragraphs 55–56, 60–62,

67–68. The following discussion also applies to these requests.

trial. The motions for a bill of particulars are denied.

## VI.

■■■■ Wexler, joined by DeHaven, moves, pursuant to Federal Rule of Criminal Procedure 7(d), to strike the aliases "Fat Boy" and "Screw" from the Indictment as prejudicial surplusage or, in the alternative, to prevent use of the aliases until the Government presents sufficient evidence at trial to link the aliases to Wexler. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990) (internal quotation marks omitted). " '[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.' " *Id.* (quoting *United States v. DePalma,* 461 F.Supp. 778, 797 (S.D.N.Y.1978) (alteration in the original)); *Gallo,* 1999 WL 9848, at *6–*7; *see also United States v. Rivera,* No. SS 89 Civ. 346, 1990 WL 52198, at *9 (S.D.N.Y. Apr.19, 1990) (disapproval of use of aliases limited to cases were aliases are not relevant). Aliases and nicknames should not be stricken from an indictment when evidence regarding those aliases or nicknames will be presented to the jury at trial. *See United States v. Ianniello,* 621 F.Supp. 1455, 1479 (S.D.N.Y.1985); *United States v. Persico,* 621 F.Supp. 842, 861 (S.D.N.Y.1985).

■■■ The Government represents that there will be evidence at trial that Wexler used the aliases "Fat Boy" and "Screw." The Government specifically points to three phone conversations recorded by Mitsui in which these aliases are allegedly used to refer to Wexler. (Exs. 12–D, 12–E, 12–F to Coleman Aff.) Wexler's counsel,

however, contends that he has reviewed the Mitsui Tapes that the Government alleges contain pertinent references to "Fat Boy" and "Screw" and that not only does the Government grossly overstate the number of times such aliases are used to refer to Wexler, but that the aliases are also used to refer to DeHaven and at least one other unknown person. (Affirmation of Peter B. Bennett dated Mar. 24, 2003 ¶¶ 7–8; Summary of Alias Uses ("Alias Summary") attached as Ex. 2 to Bennett Aff.) It appears that Wexler addresses De-Haven as "Screw" on at least 15 instances on the tapes, that Wexler addresses DeHaven as "Fat Boy" at least four times, and that DeHaven refers to an unknown person as "Fat Boy" at least twice. (Alias Summary.) Moreover, Wexler contends that the tapes reveal only three instances in which DeHaven referred to Wexler as "Screw" or "Fat Boy." (Alias Summary.)

The use of the aliases to refer to multiple people undercuts their relevance in identifying Wexler. It may be that there is evidence at trial identifying Wexler by the aliases at issue. Indeed those aliases may be part of the identification of voices on the tapes. At argument, Wexler's counsel did not dispute that identification evidence should not be reasonably excluded at trial. However, there is no reason at this point, before such evidence is presented at trial, to refer to any of the aliases in the Indictment. Therefore, the parties should refrain from referring to the allegations in the Indictment concerning aliases until there has been such evidence at trial. The motion to strike is denied without prejudice to renewal at the conclusion of the evidence. *See United States v. Persico,* 621 F.Supp. 842, 861 (S.D.N.Y.1985).

## VII.

Rittweger, joined by Wexler, moves for copies of all exhibits that the Government

**294**

intends to use at trial. The Government represented at argument that it intends to provide an exhibit list and copies of documents that the Government intends to offer in evidence at trial approximately one week before the trial will begin. This is sufficient. The defendants' motion is denied as moot. *See United States v. Falkowitz*, 214 F.Supp.2d 365, 392–93 (S.D.N.Y.2002).

## CONCLUSION

For the foregoing reasons already explained, the motions are denied except as noted above.

**SO ORDERED.**